# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

-v-

**RONALD DOUDS,**

        **Defendant.**

**Case No. 3:08-cr-094**

**Judge Thomas M. Rose**

_____

### ENTRY AND ORDER OVERRULING DOUDS' MOTION TO SUPPRESS (Doc. #46) AND SUPPLEMENTAL MOTION TO SUPPRESS (Doc. #56)
_____

Plaintiff Ronald Douds ("Douds") has been indicted on five Counts. (Doc. #36.) Count One is for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). Count Two is for use of a firearm in a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Counts Three and Four are for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g) and 924(a)(2). Count Five is for possession of cocaine base in violation of 21 U.S.C. § 844(a). Douds has also been indicted for forfeiture of firearms allegedly involved in or used in Count Four. A trial of these charges is set for July 20, 2009, although a Motion To Continue the trial date (doc #73) is pending.

Now before the Court is Douds' Motions To Suppress. Douds filed a Motion To Suppress Statements and Evidence on August 27, 2008. (Doc. 46.) On October 29, 2008, he filed a Supplemental Motion To Suppress which requests a *Franks* hearing to challenge the veracity of a statement used to obtain a search warrant. (Doc. #56.) A hearing on these motions was conducted on October 21, 2008, and on February 18 and March 23, 2009. On May 11, 2009, Douds submitted his Brief In Support of His Motions To Suppress. (Doc. #63.) On June 9, 2009,

the Government filed its Opposition To Defendant's Motion To Suppress. (Doc. #70.) On June

19, 2009, Douds replied. (Doc. #72.) Douds' Motions are, therefore, ripe for decision.

Findings of the relevant facts will first be set forth. This will be followed by an analysis

of Douds' Motions To Suppress.

## FINDINGS OF RELEVANT FACTS

### Douds' Parole

Douds, a multiple convicted felon, was on active parole with the State of Ohio up to and

including July 12, 2008. (10/21/2008 Transcript ("Tr.") 13-14.) After his most recent release

from prison in late 2006, Douds met with Karen Johnson ("Johnson"), a parole officer in

Columbus, Ohio. (2/18/2009 Tr. 119-21.) After confirming his identity, Johnson verbally

explained and provided Douds with a form explaining his conditions of parole. (Id. at 121.)

Douds signed this form. (Id.) Among others, Douds agreed to the following conditions of parole:

> I will always keep my supervising officer informed of my residence and my place
> of employment. I'll obtain permission from my supervising officer before
> changing my residence or my employment.

> I will not purchase, possess, use, own or have under my control any firearm,
> ammunition, dangerous ordinance or weapon.

> I agree not to associate with persons having a criminal background… without
> prior permission of my supervising officer.

> I agree to a search without warrant of my person, my motor vehicle or my place
> of residence by a supervising officer or other authorized representative of the
> Department of Rehabilitation and Correction at any time.

(10/21/2008 Tr. 10-11.)

In approximately February of 2007, Douds sought and received permission to move to

6014 Bellecreek, Trotwood, Ohio. (Id. 15.) Following his relocation, Douds was assigned to

Parole Officer Sharlynn Key ("Key") in Dayton. (3/23/2009 Tr. 56-57.) While under Key, Douds' conditions of parole remained the same. (Id.) In approximately June of 2007, Douds was reassigned to Parole Officer Scot Donley ("Donley"). (10/21/2008 Tr. 13-14; 3/23/2009 Tr. 57.) During this time, Douds never indicated to his parole officer that he had moved to a new address. (10/21/2008 Tr. 13-14; 3/23/2009 Tr. 57; 4/23/2009 Tr. 71-73.)

## The Bank Robbery

At approximately 2:00 p.m. on July 2, 2009, a black male entered the Fifth Third Bank at Shiloh Springs Road, produced a firearm and robbed the bank. Lead Detective Kathleen Miller ("Miller") and other Trotwood Police Officers arrived at the bank shortly after the robbery and began interviewing witnesses and processing the area. (2/18/2009 Tr. 30-35.)

Miller's responsibilities regarding the bank robbery included trying to solve the robbery, interviewing witnesses, following up on leads, coordinating the roles of other officers, preparing any search warrants and working with the Federal Bureau of Investigation ("FBI"). (Id. at 30.) In addition to her own investigative work, Miller relied upon reports which other officers prepared. (Id. at 31, 36.)

Miller obtained various descriptions of the robbery suspect from the bank tellers and customers present inside the bank when it was robbed. (Id. at 37, 54.) She summarized the description as follows:

> Suspect is described as being a black male wearing sunglasses, a wig that was
> brunette with red in it. The hair came back down his neck or back down past his
> shoulders. He is about 5-foot-11. 160. Very bad complexion, that look like bad
> acne and looked like he needed a shave. He was wearing black sweat pants, gym
> shoes, a blue sweatshirt top. Possibly a grey shirt underneath. Not positive on
> that. Was in his 30's. He ran as if he had no arches and had flat feet. He was right
> handed and also wearing light blue pin stripe boxers.

(Id. at 54.)

As part of the robbery investigation, Trotwood police requested the assistance of Riverside canine officer David Schmidt ("Schmidt") and his canine Fado to track the suspect's scent from the bank. (3/23/09 Tr. 15.) After speaking with Trotwood police, Schmidt deployed Fado and commanded him to track the robbery suspect's scent. (Id. at 15-16.) Fado tracked the suspect from the Fifth Third Bank east in the parking lot to Denlinger Road, then south along Denlinger behind a group of businesses, and then west along Salem Avenue. (Id. at 17-18.) There Fado lost the suspect's scent and Schmidt called off the track. (Id.) The results of the track were reported to Miller. (2/18/09 Tr. 67-68.)

## The Subsequent Investigation

After completing their on-site investigation, Trotwood police broadcast a video of the robbery suspect that was taken from the bank surveillance cameras. (Id. at 46.) On either July 3 or July 4, Miller received telephone information from an individual unknown to her who indicated that she heard about a black male fitting the robber's description who was staying at 3132 Wexford Place. (Id. at 50, 55.) The caller stated that the black male went by the name "Ronnie," lived with a girl named "Lish," had been bragging about robbing the bank and had been flashing and spending a lot of dye-stained money buying furniture for his girlfriend and her kids. (Id. at 49-50, 57.) The caller also indicated that the black male drove a gold Intrepid bearing a certain license plate number. (Id. at 50.) Finally, the caller indicated that Ronnie had been in prison for some time. (Id. at 56.)

Miller ran the license plate number given by the caller. (Id. at 55-56.) The vehicle was owned by an individual named Keisha Bell with an address of 4915 Biddison Avenue. (Id.)

Miller checked Dayton police records and found a report of an altercation between Alicia Crutchfield ("Crutchfield") and Ronald Douds that occurred at the 3132 Wexford Place address on or about July 1, 2007. (Id. at 56.) She also checked prison records and discovered that Ronald Douds has recently been released from prison, as the caller had claimed. (Id.)

Miller received additional information from the video broadcast. On July 2, 2007, Miller was told by another Trotwood policy officer that an unknown source had called and indicated that he had seen the individual that was shown on the video walking around Shiloh and Denlinger towards the bank prior to the robbery. (Id. at 46-47.) The unknown caller indicated that the person he saw appeared to be white and wore a blonde and red wig. (Id. at 47.)

In addition to the two unknown callers, Miller received information from Trotwood police officers that Domino's pizza drivers had been paid with red-dye stained money on two occasions when delivering pizzas to 4915 Biddison. (Id. at 77.) The description of the individual using the dye-stained money to purchase pizza was not determined to be consistent with Douds' description (Id. at 66.)

## The Search Warrant

Based upon the information that she had garnered, Wilson obtained a search warrant for 3132 Wexford Place and for a gold Intrepid. (Id. at 5.) To obtain the search warrant, Wilson alleged, in part, the following:

> The bank robbery suspect was described as a light skinned black male, approximately 6' tall, slender to medium build, wearing sunglasses, a ball cap, sweatshirt and a brown and red wig.

> A passer by called and advised that the person we showed on television as being the suspect in the bank robbery was seen by him coming from the east (Denlinger Road) area going west towards the bank right before the robbery.

-5-

Two reports were made by two separate Domino's Pizza drivers…. we were advised by the drivers that on 7-6-2007 they went to 4915 Biddison Ave. to deliver a pizza and a black male had a large wad of hundred dollar bills and attempted to pay with one of the one hundred dollar bills and the bill had a red dye on it. They would not accept the bill. On another visit the same day, 7-6-2007, Domino's went back to 4915 Biddison Ave. and the driver was given two ten dollar bills, both containing pink/red dye.

The person who rents the apartment at 4915 Biddison Ave. is identified as Keisha Bell.

A confidential source whose information was found to be accurate and reliable through independent investigation, called the police department and advised that she heard about a black male, fitting the description of the robber, staying at 3132 Wexford Place and that he was bragging about doing the robbery and has been spending a lot of money, stained with red dye, buying furniture for his girlfriend and kids. The suspect was described as being named "Ronnie," black male, possible bi-racial who lives with a girl named "Lish" at 3132 Wexford Place and has been seen driving a gold Dodge Intrepid with Ohio License - - - - - -. The Confidential Source also stated that Ronnie was recently released from prison.

When running this vehicle it comes back to Keisha Bell at 4915 Biddison Ave., Trotwood, Ohio 45426 the same residence the tainted money came from and was confiscated by this department.

Dayton Police Department records show a report being made on July 1, 2007 at Wexford Place, Dayton, Ohio, involving a misdemeanor assault on Alicia Crutchfield with suspect being Ronald Douds. This would account for the name "Lish" and "Ronnie" that the Confidential source gave us.

When running a criminal history check on Ronald "Ronnie" Douds it was learned that he has prior felony convictions, to include aggravated robbery.

4915 Biddison Ave. is located to the east of the Fifth Third Bank; approximately a quarter mile on Shiloh Springs Rod, and also a police K-9 tracked a scent from the bank heading east, the same direction towards Biddison Ave.

(Gov. Ex. 2.)

The search warrant for 3132 Wexford Place was issued by a Dayton Municipal Court

Judge on July 12, 2007. (Id.) The search warrant authorized the search of the residence,

outbuildings associated with the curtilidge, persons located at the residence, and any vehicle

found related to the address to include a gold Dodge Intrepid. (Id.)

During the morning hours of July 12, 2007, police officers and FBI agents went to 3132 Wexford Place. (10/21/2008 Tr. 40.) They watched the residence for one to one and one half hours. (Id.) During this time they did not see Douds in or around the residence nor did they see him in or around the gold Intrepid. (Id. at 42.)

The agents that were watching the residence contacted Donley, Douds' parole officer, to assist them in their investigation and to conduct his own investigation regarding the terms of Douds' parole. (Id. at 8, 14.)  Donley was told that Douds was a bank robbery suspect and they were watching a vehicle known to be used by Douds. (Id. at 14-15.) Donley was advised that the agents had credible information that Douds had been driving the gold Intrepid and had been living at 3132 Wexford. He was also advised that Douds had been spending dye-stained money, had a large amount of money in his possession, and was buying furniture. (Id. at 16.)

The search warrant then arrived and the officers searched the residence, the gold Intrepid and a blue Oldsmobile that was at the scene. (Id. at 17.) During the search, the agents recovered dye-stained money and a bullet from the residence and a box of 38 caliber bullets from the blue Oldsmobile. (2/18/2009 Tr. 82; 10/21/2008 Tr.19.)

Donley and other law enforcement officers then proceeded to 6014 Bellecreek, the location that Douds had represented to parole officers to be his current address. (10/21/2008 Tr. 15-18.) There, Donley spoke with Douds' brother who advised that Douds no longer lived there. (Id.)

Based upon the information that Douds was spending the dye-stained money from 4915

Biddision Avenue, the officers, including Donley, next proceeded to that location. (Id. 20-21.) The owner of the residence at 4915 Biddison was Keisha Bell, who was also on probation as was Douds. (Id.)

The officers, including Donley, knocked on the door of the residence at 4915 Biddision Avenue but received no answer. (Id. at 22.) They waited 10 to 15 minutes and then entered the residence. (Id.) Inside, Donley saw, in plain view, a hat and a wig like those used in the robbery. (Id.)

Based upon his investigation at these various locations, Donley obtained an arrest warrant for Douds. (Id. at 24-25.) The arrest warrant was based upon Douds' various parole violations including his failure to advise of his change of address; the recovery of ammunition from a car that he had been known to drive; his association with Bell, a convicted felon; and his alleged participation in the bank robbery. (Id.)

## The Arrest

On July 16, 2007, law enforcement received an anonymous tip that Douds was located in a parking lot at a Kroger grocery store at Needmore and Dixie. (Id. at 85-88.) FBI agent Bob Buzzard ("Buzzard") advised Donley who went to the Kroger store. (Id. at 26.)

When they arrived, the parole officers, including Donley, observed Douds sitting in a parked van at the Kroger store. (Id. at 88.) Dayton police officers who had gone to the Kroger store ordered Douds out of the van. (Id. at 28.) They eventually had to pull him out of the vehicle. (Id.)

The Officers then secured Douds and asked him if he had any weapons with him. (Id.) Douds indicated that he had a weapon on his person and another gun inside of the van. (Id. at

29.)

The Officers located the owner of the van who consented to a search of the van. (Id. at 76, Gov't Ex. 5.) The Officers recovered a revolver and crack cocaine inside the vehicle. (Id. at 78.)

Douds was arrested on a parole violation and transported to the Trotwood Police Department. (3/23/2009 Tr. 77, 86.) There he was placed in an interview room. (2/18/2009 Tr. 13.)

## The Interrogation

Upon arrival at the Trotwood Police Department, Miller advised Douds of his Miranda rights using the Trotwood Police's pre-interview form. (2/18/2009 Tr. 10-14; Gov't Ex. 7.) After advising Douds of his Miranda rights, Miller questioned Douds about alcohol and drug consumption. (Id. at 15.) Mr. Douds responded that he had smoked weed and drank alcohol earlier that day. (Id. at 15, 89-90.) However, Douds appeared to be sober and coherent to Miller and Trotwood Police Detective Pigman ("Pigman"). (Id. at 90-91, 133.)

Douds then spoke with Miller acknowledging a series of felony offenses for which he had been convicted. (Id. at 20-22.) Douds also made several inculpatory statements about the bank robbery. (Id. at 96-97.) During this process, the officers provided Douds with water, provided him an opportunity to use the restroom and permitted him to visit with Crutchfield, his girlfriend. (Id. at 22.)

When Douds asked and was informed that the bank robbery involved federal charges, he asked to speak to federal agents. (Id. at 22-24.) Miller then ceased questioning Douds and contacted Special Agent Timothy Ferguson ("Ferguson") of the FBI. (Id. at 24.)

Ferguson arrived at the Trotwood Police Department at approximately 3:30 p.m. (Id. at 183-85.) After confirming that Douds had been *Mirandized*, Ferguson entered the interview room and informed Douds that he wanted to discuss the bank robbery. (Id. at 184-85.) Douds told Ferguson that he would talk but wanted a guarantee of only ten years in prison. (Id.) Ferguson responded that he could not make such a promise. (Id.)

During the discussion with Ferguson, Douds again asked to see Crutchfield. (Id. at 186.) Ferguson allowed this to occur in the interview room. (Id.)

After a minute or two, Crutchfield left and Ferguson continued questioning Douds. (Id. at 187.) Douds insisted that Crutchfield was not involved in the robbery and Ferguson told Douds that he had no plans to charge Crutchfield. (Id. at 186-87.)

After Douds asked another series of sentencing questions, he agreed to tell Ferguson everything about the robbery but wanted to speak to an attorney first and wanted a prosecutor present as well. (Id. at 190.) Ferguson then terminated the interview and told Douds that he would arrange for a proffer once Douds had an attorney. (Id. at 190-91.) Ferguson then left the room. (Id.)

A short time later, Detective Brad Williams ("Williams") was escorting Crutchfield down a hallway into an adjoining interview room (Id. at 148-49.) Douds observed this and began knocking on the window to get Williams' attention. (Id.) Doud asked Williams what was happening to Crutchfield. (Id.) Williams responded that Crutchfield was there as part of an investigation and that he assumed that she may be arrested. (Id. at 148.) Douds then said that Crutchfield was not involved and that he again wanted to speak with the federal agent. (Id.) Williams then found Ferguson and brought him back to the interview room. (Id. at 149.)

As Ferguson stood beside him, Williams asked Douds several times if he was withdrawing his request for an attorney and requesting to speak with Ferguson. (Id. at 149.) Douds said that he was withdrawing his request for an attorney and that he wanted to speak with Ferguson about the bank robberies. (Id. at 149-50.) Ferguson then reentered the interview room to speak with Douds. (Id. at 149-50, 165, 192-93.)

During this second interview with Ferguson, Douds made a series of statements regarding the bank robbery and indicated that he was high using alcohol and drugs during the time of the robbery. (Id. at 193-94.) Ferguson then asked Douds to complete a statement form telling him basically in his own words everything that happened regarding the bank robbery. (Id. at 194.) After a period of time, Douds was taken into the detective section to watch a video of a different robbery to determine if he had committed that robbery as well. (Id. at 195.) Ferguson noticed that Douds had torn up the statement after writing about robbing two banks. (Id.)

Douds offered a different version of the events that took place during his interview. (3/23/2009 Tr. 166-80.) However, the Court does not find his testimony regarding the interview process to be credible.

Douds says Williams shoved him against the wall several times and he then agreed to waive his rights and that he was given the details about the robbery by the officers so that he could confess to it. (Id.) However, he is unclear as to the sequence of events, the number of officers involved at various times or the number of papers that he signed. (Id.) Further, he says he did not receive any injuries from being thrown around (Id.)

During his testimony, Douds acknowledge that he had moved from his Bellecreek residence. (Id. at 181.) He also testified that, following his departure from the Bellecreek

residence, he eventually moved in with Crutchfield at 3132 Wexford Place. (Id. at 186.) However, the apartment at 3132 Wexford Place and the utility bills were in Crutchfield's name. (Id. at 196-97.) Further, Douds testified that he saw Crutchfield only once between July 3 and when he was arrested on July 16, 2007. (Id. at 200.)

## ANALYSIS

Douds argues that the search of 3132 Wexford Place and the blue Oldsmobile found there was not supported by a valid search warrant and the search of the blue Oldsmobile exceeded the warrant's scope, that his arrest on parole violations violated his Fourth Amendment right to be free from arrest and that inculpating statements that he made after his arrest must be suppressed. Each of the three branches of Douds Motions To Suppress will be addressed seriatim.

## The Search of Wexford Place and the Blue Oldsmobile

Douds first argues that the search of 3132 Wexford Place and the blue Oldsmobile found there was not supported by a valid search warrant and the search of the blue Oldsmobile exceeded the warrant's scope. The Government argues that Douds lacks standing to challenge the search of Wexford Place and the blue Oldsmobile because he has failed to establish a legitimate expectation of privacy in Wexford Place and in the automobiles located at Wexford Place. In the alternative, the Government argues that Douds was a parolee and thus his residence and person were subject to suspicionless search. As a third alternative, the Government argues that the search of Wexford Place was pursuant to a valid search warrant.

### Standing

A defendant may challenge violation of Fourth Amendment rights regarding a search only if the defendant has standing to do so. *United States v. Mastgromatteo*, 538 F.3d 535, 544

(6th Cir. 2008. Standing in Fourth Amendment cases is determined by deciding whether the defendant has established a legitimate expectation of privacy in the area searched or the items seized. *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005). Finally, a defendant claiming that a search violated Fourth Amendment rights has the burden of demonstrating that he or she had a legitimate expectation of privacy in the place that was searched. *Mastgromatteo*, 538 F.3d at 544(citing *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).

A place to be searched need not be the defendant's home in order for the defendant to have a legitimate expectation of privacy. *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005). This is because the Fourth Amendment protects people, not places. *Id.*

To show a legitimate expectation of privacy, a defendant must satisfy a two-pronged test. *Id.*(citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000), *cert. denied*, 531 U.S. 999 (2000)). First, the defendant must manifest an actual, subjective expectation of privacy. *Id.* Second, the expectation of privacy must be one that society is prepared to recognize as legitimate. *Id.*

For example, an overnight guest may be able to show a legitimate expectation of privacy in the home of his host. *Talley*, 275 F.3d at 563. However, individuals who are in another's home solely for business purposes, as opposed to personal purposes, do not have an expectation of privacy. *Id.* Also, those who wrongfully live in a residence may not claim an expectation of privacy. *Whitehead*, 415 F.3d at 587.

In this case, Douds has identified evidence that he was living at 3132 Wexford Place when the search warrant was executed. Donley testified that he believed that Douds was living at 3132 Wexford when the search warrant was executed. (10/21/08 Tr. 15-16, 17, 68.) Miller

testified that the confidential informant told her that Douds stayed at 3132 Wexford. (2/18/09 Tr. 63-65.) Also, the affidavit Miller submitted to obtain the search warrant indicates that Douds was staying at 3132 Wexford. (Gov't Ex. 2.) Finally, Douds testified that he had a key to 3132 Wexford Place and that Crutchfield helped him move his personal belongings into the residence there and permitted him to come and go as he saw fit. (3/23/09 Tr. 132.)

The Government argues that Douds' testimony is unbelievable and identifies specific conflicting statements. However, as indicated above, there is more evidence that Douds was living at 3132 Wexford Place than just his testimony.

Therefore, Douds has a legitimate expectation of privacy at 3132 Wexford Place and thus has standing to challenge the warrant issued to search 3132 Wexford Place. However, Douds has presented no evidence that he had a legitimate expectation of privacy in the blue Oldsmobile. Thus, he has no standing to challenge the search of the blue Oldsmobile.

Suspicionless Search

The Government argues that Douds was a parolee and thus his residence and person were subject to suspicionless search. Douds responds that the search of 3132 Wexford Place[1] was not justified because the Parole Officers were not supported by reasonable cause.

Generally, the Fourth Amendment protects against an unreasonable search of a person or residence. *Sampson v. California*, 547 U.S. 843, 848 (2006) The Fourth Amendment, however, does not prohibit a police officer from conducting a suspicionless search of a parolee. *Sampson*, 547 U.S. at 857. The Sampson Court relied upon a provision of California law requiring parolees to submit to suspicionless searches "at any time." *Id.* at 852. The Court also relied upon a state's

---

[1] Douds does not have standing to challenge the search of the blue Oldsmobile.

"overwhelming interest" in supervising parolees because parolees are more likely to commit future criminal offenses. *Id.* at 853. However, the California law in question prohibits "arbitrary, capricious or harassing" searches. *Id.* at 856. The Supreme Court ultimately found that parole officers are not prohibited from conducting suspicionless searches so long as the supervising officer does not do so to simply harass the parolee.

Thus, the warrant and probable cause requirements generally do not apply to searches of parolees. *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008). Further, reasonable-suspicion standards do not apply. *Id.* at 310. This is because parolees have fewer expectations of privacy than probationers, and thus it is reasonable to conduct a suspicionless search of a parolee. *Id.* (citing *Sampson*, 547 U.S. at 850).

Douds mistakenly argues that Ohio law, which provides that officers may search a parolee's person or residence without a search warrant if the officers have reasonable grounds to believe that the individual is not abiding by the law or otherwise is not complying with the terms and conditions of release (Ohio Rev. Code § 2967.131(C)), applies to this case. However, the fact that an Ohio law may provide greater protection against searches and seizures than the Fourth and Fourteenth Amendments is not applicable to a defendant, such as Douds, in a federal court being prosecuted for a federal crime. *See United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)(citing *Elkins v. United States*, 364 U.S. 206, 224 (1960); *see also United States v. Allen*, 954 F.2d 1160, 1168 (6th Cir. 1992)(a state may have a stricter standard of search and seizure law but such standard does not apply in federal court).

Thus, because the charges against Douds are federal, federal constitutional law is applicable and neither warrant and probable cause requirements apply nor does the reasonable

suspicion standard found in Ohio Rev. Code § 2967.131(C). Further, there is no evidence that the search of 3132 Wexford was simply to harass Douds. Thus, Douds was subject to a suspicionless search.

Even if the requirements of Ohio Rev. Code § 2967.131(C) did apply, they were satisfied and Douds would still not be entitled to suppression on that basis. Donley, Douds' Parole Officer at the time, had reasonable grounds to believe that Douds was not abiding by the law or was otherwise not complying with the terms and conditions of his release. Parole Officer Donley had reasonable grounds to believe that Douds was a suspect in a bank robbery, that Douds had been spending dyed money and that Douds was currently residing at 3132 Wexford Place. (10/21/08 Tr. 14-16.) This is enough to justify a search of 3132 Wexford Place, pursuant to Ohio Rev. Code § 2967.131(C), by Donley without a warrant.

Thus, even though Douds may have standing to object to the search of 3132 Wexford Place, as a parolee, his residence and person were subject to a suspicionless search and a search warrant was not required. However, a search warrant was obtained.

The Search Warrant

Douds argues that the search of 3132 Wexford Place and the blue Oldsmobile found there was not supported by a valid search warrant and the search of the blue Oldsmobile exceeded the warrant's scope. As determined above, Douds does not have standing to challenge the search of the blue Oldsmobile, and the Government argues that the search of 3132 Wexford Place was pursuant to a valid search warrant.

The Fourth Amendment prohibits the issuance of a search warrant that is not based upon probable cause. *United States v. West*, 520 F.3d 604, 609 (6th Cir. 2008) To determine if

probable cause exists, an affidavit must be submitted that contains adequate supporting facts about the underlying circumstances, either from direct knowledge of the affiant or from reliable hearsay information. *Id.* Bare conclusions are not enough. *Id.*

The issuer of the search warrant must decide whether, given all the circumstances set forth in the affidavit, including the veracity and "basis of knowledge" of persons providing hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The affidavit must indicate that contraband or evidence will be found and not merely that the owner of the property is suspected of committing a crime. *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006).

The decision to issue the search warrant is to be afforded great deference. *Loggins*, 777 F.2d at 338. However, the reviewing court must assure itself that the issuer's decision was not a "mere ratification of the bare conclusions of others." *Id.*(citing *Gates*, 462 U.S. at 238).

If the defendant establishes, by a preponderance of the evidence, that the affidavit includes a false statement, the false statement is set aside. *Mastromatteo*, 538 F.3d at 545. If the remaining content of the affidavit is enough to establish probable cause that there is a fair probability that contraband or evidence of crime will be found, the search warrant is to be considered valid. *Id.* If not, the search warrant must be voided and the fruits of the search suppressed. *Id.*

A confidential informant's tip is hearsay. Two factors are considered to determine whether an affidavit based upon a confidential informant's tip provides probable cause to issue the warrant. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008). The first factor is

whether the tip includes an explicit and detailed description of the alleged wrongdoing and the second is whether the tip was corroborated by the affiant's independent investigative work. *Id.*

However, an affidavit is not considered insufficient merely because it does not include explicit details and because not every hearsay statement is corroborated. *Id.* The two factors are not to be rigidly applied but are to be used as guides. *Gates*, 462 U.S. at 230. The issuer must consider the totality of the circumstances and make a "practical, common-sense" decision as to whether all of the circumstances set forth in the affidavit lead to the conclusion that there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. *Id.*

In this case, Douds argues that the affidavit submitted by Miller to obtain the warrant to search 3132 Wexford Place and the vehicles does not reasonably lead a judge to conclude that evidence would be discovered at 3132 Wexford Place or in a vehicle located there except for the unverified hearsay statements that a black male fitting the bank robber's description was staying at 3132 Wexford, had been spending a lot of red dye stained money and had been seen driving a gold Intrepid registered to Keisha Bell. Douds also argues that the affidavit fails to provide any indication that money or evidence related to the bank robbery would be found inside the Wexford residence or inside any automobile. Finally, Douds argues that the affidavit contains deliberately reckless falsehoods and knowingly omitted information, specifically the affiant deliberately misstated the K-9 track results, the affiant described the robbery suspect as a light-skinned black male, the affiant never observed Douds driving a gold Intrepid, the affiant never observed Douds entering 3132 Wexford Place and the affiant failed to verify the informant's claims that Douds had been bragging about the robbery and spending dye-stained money.

However, in view of the totality of the circumstances, Miller's Affidavit contains sufficient information to establish probable cause to search 3132 Wexford Place and the vehicles located there. A confidential source indicated that she heard about a black male fitting the bank robber's description was staying at 3132 Wexford Place, was bragging about doing the robbery and was spending a lot of dye-stained money. The confidential source indicated that the suspect was named "Ronnie", a black male, possibly bi-racial, who lives with a girl named "Lish" at 3132 Wexford Place. The confidential source also indicated that "Ronnie" had been seen driving a gold Intrepid and provided the license number thereof. Finally, the confidential source indicated that "Ronnie" had recently been released from prison.

Verification of the confidential source's information included running the license plate number provided for the gold Intrepid. This vehicle was registered to Keisha Bell who resided at 4915 Biddison Avenue, the location from which the pizza drivers had been given red dye-stained money. Verification also included checking Dayton Police Department records which indicated that a misdemeanor assault report was made on July 1, 2007, at 3132 Wexford Place in which Alisha Crutchfield was allegedly assaulted by Ronald Douds. Verification also included the description of the bank robber provided by witnesses to the robbery as a "light skinned black male." Finally, Miller found that Douds had prior felony convictions that included an aggravated robbery. Thus, large portions of the confidential source's statement were corroborated before the search warrant was sought. The hearsay statement was, for the most part, verified.

In addition to the hearsay statements provided by the confidential source and the stated corroboration thereof, Miller affirms that 4915 Biddison Avenue is located to the east of the bank that was robbed and a police K-9 tracked a scent from the bank heading east.

Thus, Miller's Affidavit provides an indication that evidence relating to the bank robbery may reasonably be expected to be found at 3132 Wexford or the vehicles located there because a reliable source, whose information was, to a large extent, verified, indicated that a black male fitting the description of the bank robber was staying at 3132 Wexford Place, was bragging about doing the robbery, was spending a lot of red dye-stained money and was seen driving the gold Intrepid.

Douds also argues that the affidavit fails to provide any indication that money or evidence related to the bank robbery would be found inside the Wexford residence or inside any automobile. However, Miller's Affidavit indicates that U.S. Currency, bank currency straps, articles with red bank dye, a brown and red wig, sunglasses, a ball cap with a monogram and firearms relating to the bank robbery may be found at 3132 Wexford Place.

Finally, Douds' argument that Miller's Affidavit contains falsehoods and knowingly omitted information is without merit. First, Miller's description of the bank robber as a "light-skinned black male" is a composition of the several descriptions of the bank robber's skin that she received at the scene of the robbery and, as such, is accurate. Second, the K-9 track results were not misstated. The bank robber's track initially headed east from the bank as affirmed by Miller albeit the scent later turned in the opposite direction. Third, Miller did not affirm that she saw Douds driving a gold Intrepid or that she saw Douds enter 3132 Wexford Place or that Douds had been bragging about the robbery or that Douds had been spending red dye-stained money. This information was provided by the confidential informant whose statement was otherwise largely and independently corroborated.

Even if Douds' argument that Miller's Affidavit contains falsehoods was well taken, the

result would be the same. The Affidavit without the alleged falsehoods would be enough for an issuer to find probable cause to issue the search warrant.

Conclusion

First, Douds has shown that he had standing to challenge the search of 3132 Wexford Place but not the search of the attendant vehicles. Further, Douds was a parolee and, as such, was rightfully subject to a suspicionless search. However, even if Douds was not subject to a suspicionless search, the search warrant for 3132 Wexford Place and the attendant vehicles was pursuant to a valid search warrant.

## The Arrest of Douds for Parole Violations

Douds was arrested on July 17, 2007, on a parole violation warrant. He now argues that his arrest on a parole violation warrant violated his Fourth Amendment rights.

A parollee, such as Douds, may be arrested based upon reasonable cause that he or she has violated a condition of parole. *United States v. Blevins*, No. 99-3500, 2000 U.S. App. LEXIS 27045 at *6 (6th Cir. Oct. 20, 2000); Ohio Rev. Code § 2967.15(A). Courts have interpreted probable cause to be at least reasonable cause. *Blevins*, 2000 U.S. App. LEXIS at *6. Probable cause exists if, under the totality of the circumstances, a reasonable person would believe that an illegal act has occurred or is about to occur. *Id.*

In this case, the parole officers had reasonable cause to believe that Douds was violating the terms of his conditions of parole. As set forth above, prior to the search of 3132Wexford Place, Donley had reasonable cause to believe that Douds was a suspect in a bank robbery, that Douds had been spending dyed money and that Douds was currently residing at 3132 Wexford Place. Following execution of the search warrant, Donley confirmed that Douds was not residing

at the location that he had previously given parole officers. (10/21/08 Tr. 16-18.) Further, Donley had information that Douds had stayed at 4915 Biddison Avenue where another parolee, Keisha Bell lived. (Id. at 19.) Finally, a confidential information had told parole officers that Douds was firing a gun in an apartment complex. (Id. at 24.)

Failing to report a change of address and to obtain permission to change addresses, use of a firearm and associating with persons having a criminal background are all violations of the conditions of Douds' parole and gave Donley reasonable cause to believe that Douds was violating his parole. Therefore, Douds' arrest on a parole violation warrant did not violate his Fourth Amendment rights.

### The Validity of Douds' Inculpating Statements

Douds argues that the inculpating statements that he made subsequent to his arrest as the result of police interrogation must be suppressed. They must be suppressed, according to Douds, because police officers continued to pressure him to talk after he requested an attorney. They pressured him to talk by telling him that they were going to charge Crutchfield with bank robbery. The Government responds that Douds' post-arrest statements are admissible because he was advised of his *Miranda* rights and expressly waived them before making a voluntary statement.

Following arrest, the police must advise a suspect of his *Miranda* rights. *Van Hook v. Anderson*, 488 F.3d 411, 413 (6th Cir. 2007). If the suspect requests a lawyer, all questioning must stop until a lawyer is provided or until the suspect himself initiates a discussion. *Id.* The court must first determine whether the suspect actually invoked his right to counsel. If so, the suspect's responses to further questions may be admitted only on finding that (a) the suspect

initiated further discussions and (b) the suspect knowingly and intelligently waived the right to counsel. *Id.* at 416 (citing *Smith v. Illinois*, 469 U.S. 91, 95 (1984)).

Even though *Miranda* rights are administered, coerced confessions that are procured by means "so offensive to a civilized system of justice" are not admissible. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)(quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). A confession is coerced "when the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Id.* (citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)). The coercion may be physical or psychological or both. *Id.*

Courts consider the totality of the circumstances when determining whether a confession has been obtained by unconstitutional means. *Id.* In assessing the totality of the circumstances, courts consider: the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. *Id.*

In this case, Douds was properly notified of his *Miranda* rights, initially talked with law enforcement officers then asked for an attorney after which questioning stopped. He then, without unconstitutional coercion, knowingly and intelligently waived his right to counsel and again spoke with law enforcement officers.

After being arrested, Douds was transported to the Trotwood Police Department where he was properly advised of his *Miranda* rights by Miller and Pigman. (2/18/09 Tr. 10-19.) Douds then spoke with Miller regarding a series of felony offenses for which he had been convicted. (Id. at 20-22.) He also made several inculpatory statements concerning his participation in the

robbery. (Id. at 96-97.) During this time, Douds was provided with an opportunity to use the restroom, he was offered food and water and he was permitted to visit with Crutchfield. (Id. at 22.)

When Douds was informed that the bank robbery concerned federal charges, he asked to speak with federal agents (Id. at 22-24.) Miller then contacted Special Agent Timothy Ferguson of the FBI. (Id. at 24.)

After confirming that Douds had been *Mirandized*, Ferguson began to interview Douds. (Id. at 184-85.) During this discussion, Douds again asked to see Crutchfield. After a minute or two, Crutchfield left the room and Ferguson continued to question Douds. (Id. at 187.) Douds insisted that Crutchfield was not involved in the robbery and Ferguson told Douds that he had no plans to bring federal charges against Crutchfield in the robbery. (Id. at 187.)

After further discussion, Douds agreed to tell Ferguson everything about the robbery but wanted to speak to an attorney first. (Id.) Ferguson then terminated the interview.

A short time later, Williams was escorting Crutchfield and another police officer down a hallway into an adjoining interview room. (Id. at 148-49.) Douds observed this and got Williams' attention. (Id.) Douds asked Williams what was happening to Crutchfield. (Id.) Williams responded that Crutchfield was there as part of a bank robbery investigation and that he assumed that Crutchfield may be arrested. (Id. at 148.) Douds then said that Crutchfield was not involved and that he wished to again speak to the federal agent. (Id.) Williams then found Ferguson and brought him back to the interview room. (Id. at 149.)

As Williams stood beside him, Ferguson asked Douds several times if he was withdrawing his request for an attorney and requesting to speak with Ferguson. (Id. at 149.)

Douds responded each time that he was withdrawing his request for an attorney and he wanted to speak with Ferguson about the bank robberies. (Id. at 149-50.) Ferguson then conducted a second interview with Douds during which Douds made several inculpating statements about the bank robbery. (Id. at 193-94.)

Douds now argues that the sole purpose behind Williams walking Crutchfield in front of the interview room and Williams telling Douds that Williams assumed Crutchfield may be arrested was to pressure Douds to change his mind about speaking to the police officers. In support of this argument, Douds identifies several alleged inconsistencies in Williams' testimony. However, whatever Williams' intent may have been, it was Douds who initiated the contact with Williams and it was Douds who agreed to withdraw his request for counsel and speak to Ferguson. Even if Douds' arguments regarding Williams are true, considering that Douds was fully aware of his *Miranda* rights, considering Douds' age, education and experience, considering the length of questioning and considering Douds' previous interaction with police as the result of prior arrests, convictions and parole, Douds knowingly and intelligently waived his *Miranda* rights. The inculpating statements that Douds made subsequent to his arrest as the result of police interrogation will not be suppressed.

## SUMMARY

Douds has standing to challenge the search of the residence at 3132 Wexford Place but has not shown that he has standing to challenge the search of the blue Oldsmobile located at 3132 Wexford Place. Further, Douds' status as a parolee residing at 3132 Wexford Place subjected 3132 Wexford Place to a suspicionless search, and, even if 3132 Wexford Place was not subject to a suspicionless search, the search of 3132 Wexford Place and the attendant

vehicles was pursuant to a valid search warrant. In addition, Douds' arrest on a parole violation warrant did not violate his Fourth Amendment rights. Finally, Douds knowingly and intelligently waived his *Miranda* rights before he made inculpating statements subsequent to his arrest. Therefore, Douds' Motion To Suppress (doc. #46) and Supplemental Motion To Suppress (doc. #56) are OVERRULED.

      **DONE** and **ORDERED** in Dayton, Ohio this Twenty-First day of July, 2009.


                      **s/Thomas M. Rose**

                     _____

                      THOMAS M. ROSE
                    UNITED STATES DISTRICT

JUDGE

Copies furnished to:

Counsel of Record